**United States District Court for the District of Columbia**

| | |
|---|---|
| CHANTEL WARD, an individual<br>1810 24th Street, NE, Apt 202<br>Washington, D.C. 20002<br><br>    And<br><br>LATRESS SMITH, an individual<br>2313 Good Hope Ct SE, Apt 203<br>Washington, D.C. 20020<br><br>    Plaintiffs,<br><br>v.<br><br>SERVICE EMPLOYEES<br>INTERNATIONAL UNION LOCAL 500,<br>a Labor Organization<br>45 West Gude Drive<br>Suite 1200<br>Rockville, MD 20850<br><br>    And<br><br>NATIONAL CHILDREN'S CENTER, INC.<br>8757 Georgia Avenue Suite 700<br>Silver Spring, MD 20910<br><br>    Defendants | Civil Action No. |

## **PLAINTIFFS' COMPLAINT FOR BREACH OF DUTY OF FAIR REPRESENTATION AND BREACH OF CONTRACT**

Comes now PLAINTIFFS, CHANTEL WARD AND LATRESS for their Complaint against the Defendants alleging:

1. This is an action for breach of a labor organization's duty of fair representation and for breach of a collective bargaining agreement under Section 301 of the Labor Management Relations Act.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the claims herein pursuant to the Labor Management Relations Act. 29 U.S.C. §185, 28 U.S.C. §1337, and 28 U.S.C. §1331. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because the circumstances giving rise to the claims occurred within this district.

## PARTIES

3. Plaintiff CHANTEL WARD (also referred to as "Ms. Ward") is a former employee of National Children's Center, Inc., whose principal place of business is located at 3400 Martin Luther King Jr Ave SE, Washington, D.C. 20032. Ms. Ward is a resident of Washington, D.C.

4. Plaintiff LATRESS SMITH (also referred to as "Ms. Smith") is a former employee of National Children's Center, Inc. Ms. Smith is a resident of Washington, D.C.

5. Defendant NATIONAL CHILDREN'S CENTER, INC., (also referred to as NCC) is a Non-profit Child Care center whose principal place of business is located at 3400 Martin Luther King Jr Ave SE, Washington, D.C. 20032.

6. Defendant SERVICE EMPLOYEES' INTERNATIONAL UNION LOCAL 500 (also referred to as Union) is a labor organization with its principal place of business located at 901 Russell Avenue, Suite 300, Gaithersburg, MD 20879.

## FACTS

7. Ms. Chantel Ward is a resident of Washington DC residing at 1810 24th Street, NE, Apt 202, Washington DC 20002.

8. Ms. Latress Smith is a resident of Washington DC residing at 2313 Good Hope Ct SE Apt. 203, Washington DC 20020.

9. Ms. Ward began her employment with National Children's Center on March February 6th, 2017 and ended June 6th, 2025.

10. Ms. Smith began her employment as a lead teacher with National Children's Center in March of 2024 and ended June 06, 2025, after previously having worked with National Children's Center with an exemplary record from May 2013 through October of 2022.

11. At all relevant times Ms. Ward and Ms. Smith were members in good standing of the SEIU Local 500 Union.

12. At all relevant times Ms. Smith's and Ms. Ward's employment was governed by a collective bargaining agreement between NCC and the Union.

13. Neither Ms. Smith nor Ms. Ward had been the subject of any disciplinary actions before the incident in question.

14. In August of 2024, Ms. Chantel Ward and Ms. Smith, the classroom lead teacher, were informed they would be receiving students who had a high risk of serious seizures.

15. Upon learning this, Plaintiffs requested training on how to recognize and respond to seizures.

16. Plaintiffs requested training on seizures several times. Plaintiff's repeated requests were ignored by Defendant.

17. In December of 2024 an incident occurred that required the transport, by ambulance, of a student with a high fever.

18. After this incident Plaintiffs again requested training. That request was also ignored.

19. On April 30th, 2025, a student with the initials DW, reported to the care of Ms. Smith and Ms. Ward.

20. When DW arrived at the classroom his therapist reported that DW was sluggish and tired during his therapy session.

21. Because DW had presented this way several times in the past they did as they had done in other prior occurrences; Ms. Ward and Ms. Smith set up a place in the classroom for DW to rest.

22. Ms. Smith then took a moment to go to the restroom and left DW in the care of Ms. Ward. At no time was the student left alone.

23. When Ms. Smith returned to the classroom a few minutes later, Ms. Smith observed DW was up and moving but began to vomit and appeared unable to support himself.

24. Once it was apparent DW was having what they thought was a seizure, Plaintiff immediately took steps to care for DW despite having never received the training they had requested many times.

25. Plaintiffs immediately attempted to contact the Health Coordinator but could not reach her.

26. Unbeknownst to Plaintiff, upon information and belief, the Health Coordinator had been terminated and sent home earlier that day.

27. Defendant NCC did not provide a replacement for the Health Coordinator to respond to medical issues or emergencies.

28. Defendant NCC did not communicate to Plaintiff that there was no one on duty to respond to medical issues and emergencies.

29. Plaintiff then contacted the center director and DW's mother.

30. The center director tried to access the medicine for DW before arriving at Plaintiffs' classroom, but it was inaccessible.

31. Upon information and belief, the center director had been informed by the executive director that the nurse was no longer on premises.

32. No steps were taken to allow alternate access to vital medicine needed by students even though the Center Director had been informed of the nurse's absence.

33. The Center Director did not have access to the medicine on hold for DW.

34. DW's mother arrived to find her child in a state of distress; his medicine had not been administered because it was locked in the Health Coordinator's office.

35. After repeated calls, access was gained to the medicine. The medicine was not administered until after the arrival of DW's mother.

36. DW's mother had to administer his medication because of the absence of a trained medical care provider.

37. DW was transported to the hospital by ambulance after his medication was administered by his mother.

38. Plaintiffs were initially praised by both the Center Director and the Executive Director for their actions in seeing to the care of DW.

39. During the incident DW's mother expressed dismay and concern at the absence of the Health Coordinator.

40. One week later on May 8th Plaintiff were placed on administrative leave pending an "investigation" of the incident without further information or explanation provided.

41. Also on May 8th, National Children's Center sent out a training email for recognizing and addressing seizures due by business close on May 9th.

42. Ms. Smith and Ms. Ward were on leave for two weeks while NCC conducted an "investigation."

43. The internal investigator issued a report rife with falsehoods and inaccuracies.

44. NCC terminated both Ms. Ward citing neglect for not recognizing and responding to DW's seizure and failure to contact the healthcare coordinator.

45. In violation of their collective bargaining agreement and against public policy Plaintiff were then terminated without cause premised on demonstrably false representations along with arbitrary and capricious reasoning.

46. Under the terms of the collective bargaining agreement the Union initiated the grievance process on behalf of Plaintiffs.

47. During the grievance process it was revealed that one of the major reasons cited for termination, the failure to report the incident to the health administrator, was made in bad faith as the health administrator had been terminated by NCC before the incident.

48. Despite this example of blatant bad faith on the part of NCC, the Union failed to perform even a minimal investigation of the other causes cited by NCC, instead accepting NCC's assertion as fact and thus entered into the grievance process in a weakened position without the ability to pushback on NCC's assertions or negotiate effectively if at all on behalf of Plaintiffs.

49. During the disciplinary and grievance process NCC falsely asserted that a finding of medical neglect had been substantiated by the Office of the State Superintendent of Education

(OSSE). In fact, on May 8th, 2025 OSSE issued a one page report that stated one finding of deficiency: "It seems appropriate seizure training must occur immediately to be able to respond to medical needs of all children." OSSE gave one plan of Correction: "Medical training must occur to manage medical need of all children especially children with seizure disorder. Provide all steps of plan to OSSE."

50. NCC asserted that Plaintiffs had received sufficient training to respond to seizure by virtue of their certifications in CPR and First Aid. In addition to the existence of the OSSE finding and plan of Corrective Action requiring specific training on seizures that gives lie to that assertion, a simple Google search would have informed the Union that in CPR and First Aid training, the Red Cross lists several symptoms of seizures, loss of consciousness, convulsions, blank stares and sudden quiet. It does not list lethargy and vomiting.

51. NCC claims in their justification that Ms. Smith was "negligent" citing to the fact that Ms. Smith was absent from the classroom for less than 10 minutes to use the restroom.

52. While Ms. Smith did leave the classroom for less than 10 minutes to use the restroom, DW and her other students were not left alone at any time because Ms. Ward was in the room for the few minutes Ms. Smith was using the restroom.

53. The Union treated both Plaintiffs positions as identical when each had specific facts that did not apply to the other. Ms. Smith left the room for less than 10 minutes to use the restroom but left DW in the care of Ms. Ward. No such allegation applied to Ms. Ward. Ms. Ward checked her phone while Ms. Smith was in the restroom. No such allegation applied to Ms. Smith. Ms. Smith had returned and noticed immediately when DW started to vomit.

54. At the end of step 2 of the grievance process, the Union communicated to plaintiffs the following: "His opinion is that the key issue with taking this to arbitration is that OSSE has

found both of you guilty of neglect. He thinks that we have an issue of 'res judicada'[sic] aka issue preclusion – basically, another body with proper jurisdiction (OSSE under the DC government) has already found fact. An arbitrator would take it as given that their judgement is correct. So then we'd have to argue that NCC as the employer is breaking the union contract by terminating you even given that fact. The contract between the union and NCC (attached) says that the employer can't terminate you without cause to an "arbitrary and capricious" standard (Article 37) . Arbitrary and capricious basically at random or without any meaningful reason. Because you have been found guilty of neglect, it isn't without a reason that NCC can show. I asked about all the other mitigating factors (eg the fact that they fired the nurse and you hadn't gotten training) – our lawyer said that in normal circumstances without the judgement from OSSE, those things would be relevant, but with that judgement standing, it's not going to be a question for the arbitrator to really look at."

55. Plaintiffs communicated to the Union that after contacting OSSE directly, OSSE had no record of a finding of neglect for the incident connected to either Ms. Ward or Ms. Smith.

56. Despite that communication, and Plaintiffs insistence that OSSE had not found them negligent, the Union continued to resist Plaintiffs request for arbitration.

57. On August 19th, three days after the deadline to request arbitration, the Union continued to apply pressure to Plaintiffs to accept NCC's final offer of a few weeks severance and a concession to allow for resignation instead of termination.  The Union communicated that August 22, 2025 was the "drop dead date" for acceptance of NCC's final offer.

58. On January 8th, 2026, the Union informed Plaintiffs they never received a copy of the report from OSSE that the Union cited as the sole reason for not proceeding to arbitration. It was at this point that Plaintiffs became aware the Union had done nothing to investigate or verify the

8

assertions made by NCC. In sum, the Union's perfunctory performance as Plaintiffs' representative in the grievance process as well as the Union's failure to perform even a minimal investigation of NCC's assertions despite continued communication from Plaintiffs that they had not been investigated while at the same time relying on NCC's misrepresentations as fact and the key reason not to proceed to arbitration constituted a breach of the duty of fair representation owed to the Plaintiffs.

59. As a result of their termination in violation of the CBA, and the Union's breach of its duty of fair representation, Plaintiffs have been substantially unemployed for a period of at least ten months, and suffered a loss of benefits and seniority, and have unjustified and unsubstantiated allegations of misconducts on their otherwise exemplary records of employment. On information and belief, the reasons documented by NCC for Plaintiffs' termination have obstructed Plaintiffs' efforts to secure employment or to advance in employment, and will continue to do so for years to come.

## COUNT I:

## BREACH OF CONTRACT

60. Plaintiffs adopt and incorporate all previous paragraphs of this Complaint as if set forth fully below.

61. Plaintiff's employment with NCC was governed under a collective bargaining agreement.

62. Article 36 of the collective bargaining agreement provides: "NCC shall have the authority to discipline and discharge employees for just cause. It is recognized and agreed between the parties that NCC must maintain and impose high standards of performance, quality of work and care. Accordingly, it is agreed that "just cause" is defined as NCC's determination that an

employee does not meet this high standard, so long as NCC does not exercise its discretion in a manner that is arbitrary, capricious, or without foundation and NCC bears the burden of showing that just cause existed.

63. Per Article 36, NCC had a duty to show just cause for Plaintiff' termination of employment and a duty to not exercise their discretion in a manner that was arbitrary, capricious, or without foundation.

64. NCC breached both duties created by Article 36.

65. NCC exercised their discretion in a manner that was demonstrably arbitrary, capricious without foundation and in bad faith.

66. The termination of Plaintiffs without cause or justification, or a reasonable basis in fact violated Plaintiffs right to continued employment, compensation, and benefits under the Collective Bargaining Agreement.

67. The documentation of Plaintiffs termination' involving misconduct, continues to falsely and unjustifiably obstruct and prevent Plaintiffs from securing employment in their field and/or from advancing in employment.

68. Plaintiffs are entitled to reinstatement to their positions with NCC; to an award of back pay, lost benefits, and restoration of seniority from the date of their termination; to expungement of their termination and the negative reasons given for their termination from their records of employment; to reasonable attorneys' fees and costs of suit as well as any other relief deemed by the court.

## COUNT 2

### Breach of Duty of Fair Representation

69. Plaintiffs refer to and incorporate by reference the allegations of paragraphs 1 through 57 as though fully set forth here.

70. The Union breached its duty of fair representation as alleged above.

71. Plaintiffs have made repeated, consistent and insistent demands on the Union to honor its duties of representation, and to investigate fully their grievance. Union has failed to do so such that no remedy is available to plaintiffs under the Union's governing documents, the CBA or provisions of law. Plaintiffs have therefore exhausted all possible administrative remedies relating to the relief sought in this action.

72. Plaintiffs are entitled to an award of damages against the Union for loss of earnings, benefits and seniority, past and future, reasonable attorneys' fees and costs of suit and any other relief deemed by the court

**WHEREFORE**, the Plaintiff prays for the following relief:

1. For judgment against NCC for breach of the Collective Bargaining Agreement, including reinstatement, back pay and loss of benefits;

2. For an injunction that Master expunge Plaintiffs' termination, and any references to alleged misconduct from Plaintiffs' records of employment;

3. For damages against the union for breach of the duty of fair representation, including damages for loss of pay and benefits, past and future;

4. For reasonable attorneys' fees and costs of suit; and

5. For such further relief as the Court deems just and proper.

**Demand for Jury Trial**

Plaintiff respectfully requests a trial by jury on all claims stated herein which by law may be tried to a jury, pursuant to the laws of the Constitution and laws of the United States.

Respectfully Submitted,

___/s/Terri Lea_____
Terri Lea, Esq., Bar No. 422762
Attorney for the Plaintiffs
10301 Grosvenor Place, Suite 803
North Bethesda, MD. 20852
terriyvnn@gmail.com
(202)534-7902